UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KASEY REED,<br><br>      Plaintiff,<br><br>   v.<br><br>FRANCISCAN ALLIANCE, INC., d/b/a FRANCISCAN HEALTH OLYMPIA FIELDS, AND LYNNE STEINHAUER, individually and in her official capacity as Supervisor/ER Manager<br><br>      Defendants. | No. 24 CV 2769<br><br>Judge Georgia N. Alexakis |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kasey Reed, a Black woman with neuropathy from cancer, worked as a patient care coordinator for defendant hospital Franciscan Alliance for two months, where she was supervised by defendant Lynne Steinhauer. Reed was terminated and sued, claiming that defendants discriminated against her on the basis of her race and disability and retaliated against her for raising her concerns about this discrimination. Defendants now move for summary judgment. [28]. For the reasons given below, that motion is granted in part and denied in part.

**I.    Legal Standards**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II. Background

The parties agree on the following facts except where noted. In setting out these facts, the Court does not credit statements of fact that are supported only by unauthenticated record materials and where a party has objected on that ground.[1]

Reed is a Black woman with neuropathy from cancer. [43] ¶ 2. Reed's neuropathy causes her to "experience numbness, pain, tingling, weakness, and sometimes her hands would cramp up." [44] ¶ 2. Reed, a registered nurse since 2014, applied for a job as a patient care coordinator at Franciscan in February 2022. [43] ¶¶ 3, 14. The patient care coordinator role "is one of the most important positions to

---

[1] On a motion for summary judgment, "the court may consider any material that would be admissible or usable at trial, including *properly authenticated* and admissible documents or exhibits." *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000) (internal citation and quotations omitted) (emphasis added). Where a document is "introduced into the record without any supporting affidavit verifying its authenticity," the document is "inadmissible and cannot be considered for purposes of summary judgment." *See Scott v. Edinburg*, 346 F.3d 752, 759–60 (7th Cir. 2003); *Renta v. Cnty. of Cook*, 735 F. Supp. 2d 957, 967 (N.D. Ill. 2010) ("Documents that are not authenticated are properly excluded, including at summary judgment."). Here, plaintiff has repeatedly objected to many of defendants' statements of fact because those statements are supported only by unauthenticated documents. *See generally* [43]; *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support … a fact cannot be presented in a form that would be admissible in evidence."). One way to authenticate a document for the purposes of summary judgment is to "attach an affidavit sworn to by a person who would be qualified to introduce the record as evidence at trial." *Woods*, 234 F.3d at 988. But defendants have not submitted an affidavit authenticating the disputed documents. *See* [31]. Nor have they argued that the documents have been properly authenticated by some other means. Indeed, defendants do not address plaintiff's objection at all in their reply. *See* [45]. Any argument as to the admissibility of these documents has therefore been waived. *See Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017) ("Failure to respond to an argument generally results in waiver.").

ensure smooth operation of the emergency room, and that it is imperative that the [coordinator] always have a 'finger on the pulse' of the department." [43] ¶ 16.

Reed was offered and accepted the coordinator job on March 25, 2022. *Id.* ¶ 18. As part of her onboarding, Reed underwent a pre-employment physical. *Id.* According to defendants, Reed completed certain paperwork associated with that physical, and they now seek to rely on that content to support their motion. *Id.* ¶ 20. The paperwork, however, has not been properly authenticated, *see supra* at note 1, so the Court sets it aside. Even if the Court were to consider it, the parties genuinely dispute whether or not Reed indicated on a health history form that she had disability restrictions or would require a job modification, and whether she was cleared to work without accommodations. [43] ¶¶ 20–22; [42] at 8. In addition, Reed testified at her deposition that she gave defendants a doctor's note indicating she was cleared to work with a ten-pound weight restriction and that she required some assistance and breaks. [44] ¶ 33; [30-3] at 31:14–22. Defendants deny that Reed actually provided such a note, though do not dispute the content of her deposition testimony. [43] ¶ 39.[2]

---

[2] At several points in their response to plaintiff's statement of additional material facts, defendants make assertions along the following lines: "admit that Plaintiff accurately recounts her deposition testimony" but deny that there is any written material to corroborate plaintiff's testimony or dispute the significance of the fact asserted in the deposition testimony. *See, e.g.*, [44] ¶¶ 4–6, 8–11. These responses are inappropriate because they are argumentative. *C.f. Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("[A] Rule 56.1(b)(3)(A) response is not the place for purely argumentative denials."). Defendants' responses also ignore the fact that deposition testimony is proper evidence upon which a party may rely to assert that a fact is genuinely disputed. *See* Fed. R. Civ. P. 56(c)(1)(A); *Margarella v. Chamberlain*, No. 3:18-CV-50031, 2022 WL 11755053, at *2 (N.D. Ill. Oct. 19, 2022) (treating statements of fact as admitted where nonmoving party denied statements based on defendant's deposition but "argu[ed] that the statements are 'Defendant Chamberlain's own testimony, not undisputed fact'"). "'Self-serving' deposition testimony may be sufficient to defeat summary judgment '[p]rovided that the evidence meets the usual

Reed also asserts that she discussed her disability and ten-pound lifting restriction directly with Steinhauer when she was initially hired, as well as with Dr. Richard Louissaint, the medical director of the Emergency Department, in mid-to-late April 2022 and with another emergency department physician at an unknown time. [44] ¶¶ 4–5; [30-3] at 34:4–38:23. Reed again gave Steinhauer "paperwork regarding the weight restriction and the need to take breaks" on April 28, 2022, and also gave Steinhauer a list of doctors' appointments. [44] ¶ 6; [30-3] 40:25–42:1. Reed had an additional conversation with Steinhauer about her disability and limitations on May 20 or May 25, 2022. [44] ¶ 6.

Tensions with Steinhauer and other hospital personnel began soon after Reed started. Reed required a laptop for her orientation and training but did not receive one until May 27, 2022. [43] ¶ 46. Defendants say this "may have been an oversight," *id.*, but Reed notes that Kelly Anderson, another new patient care coordinator who is white, received a laptop earlier even though Reed started before Anderson and had complained about not having a laptop several times. [44] ¶ 21; [30-3] 187:2–24. Reed also felt pressured to complete her training more quickly than Anderson, [44] ¶ 20 (citing [30-3] at 183:1–19), though defendants assert that Reed had the standard 30 days to complete the training, *id.* (citing [30-3] at 172:21–24).

---

requirements for evidence presented on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial." See *Lewis v. Lucent Techs., Inc.*, No. 02 C 4953, 2003 WL 22682318, at *4 (N.D. Ill. Nov. 13, 2003) (quoting *Payne v. Pauley,* 337 F.3d 767, 773 (7th Cir. 2003)). Defendants do not argue that plaintiff's testimony fails to meet these requirements.

Steinhauer, who is white, also used the phrase "cotton picking" around Reed on multiple occasions. [43] ¶ 47. The Court understands defendants' position to be that Steinhauer used this phrase to mean that work at the hospital was particularly busy or onerous on a given day. *Id.*; *see* Oxford English Dictionary Online, https://www.oed.com/dictionary/cotton-picking_n (last visited February 26, 2026) (defining "cotton-picking (adj.)," as "A general term of disapproval or abuse, = 'damned'."). At the same time, the Court recognizes plaintiff's position: that the phrase originates in the American South as a reference to the difficult agricultural labor performed by Black enslaved people and sharecroppers and is therefore seen to be belittling of that labor. [42] at 6; *see also* Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/cotton-picking (last visited February 26, 2026). Steinhauer used the phrase even after Reed asked her to stop because Reed considered the phrase racist. [43] ¶ 47; [44] ¶ 25.

Reed also perceived racial animus from other employees. Reed asked Karen Moates, a white nurse who was training Reed, for assistance on several occasions but was refused. [44] ¶¶ 10–11. Moates did, however, help a white nurse who asked for assistance. *Id.* ¶ 11. Defendants do not dispute that Moates refused to help Reed or that Moates did help another white nurse but deny that this "had anything to do with discriminatory animus or a failure to accommodate" because "[t]here are many reasons Karen Moates may have been unable to assist in that moment in the busy [emergency department]." *Id.* ¶ 10. The denial is argumentative, and defendants do

5

not cite record evidence to support it, so the Court does not credit it. *See supra* at note 2; N.D. Ill. L.R. 56.1(e)(3).

The parties agree that Reed had trouble performing her assigned tasks but characterize this trouble in very different ways. Reed says that she was "forced to work with no restrictions" and "was given full assignments" on May 3, May 5, and either May 20 or 22, 2022. [44] ¶ 7. This included lifting a 300-pound patient and helping another patient sit up in a bed. *Id.* Reed told Steinhauer that she needed breaks, but was told: "Well, this is ER, and this is how it's going to be. And sometimes you're not going to get a break. That's how it is." *Id.* ¶ 8; [30-3] 44:4–16.

Other nurses also declined to help Reed. When Reed told Moates and another nurse "I need a break, you know I'm in pain," they denied her the break because the hospital was busy. [44] ¶ 9; [30-3] at 44:4–16. On May 3 and May 5, 2022, Reed told Steinhauer that she was in pain and had not received a break, though Reed cannot recall Steinhauer herself denying a break that Reed requested. [44] ¶ 23; [30-3] 52:7–9. Reed also told Steinhauer[3] that "she couldn't walk when she worked the shift with no breaks" and requested breaks to help her deal with the pain from other nurses on May 3 and May 23 but received none. [44] ¶¶ 26–27, 31; [30-3] at 206:20 –210:7.

In defendants' account, "it quickly became clear [Reed] was not meeting the requirements of the role" soon after she began working at the hospital. [43] ¶ 28. This

---

[3] Reed's Statement of Additional Material Facts uses the name "Lauren," but the paragraph cites to a portion of Reed's deposition discussing interactions with Lynne Steinhauer, and no one named Lauren is mentioned elsewhere in the record, so the Court understands this to be a scrivener's error. *See* [44] ¶ 26.

6

is because, according to defendants, hospital supervisors received reports from hospital staff that Reed was making mistakes during treatment or otherwise lacked necessary skills and knowledge. *Id.* ¶¶ 28–29. Defendants seek to support these statements of fact with a series of unauthenticated documents, which the Court does not credit. *See supra* at note 1. Even if the Court were to credit the unauthenticated material, Reed denies the allegations of underperformance. [43] ¶¶ 28–29 (citing [30-3] at 101:5–23, 102:3–20, 120:8–13). Reed further asserts that white nurses were biased against her because "I was over them, and I just was being undermined." [44] ¶ 13; [30-3] at 106:12–13. Reed does not recall race-based remarks from the white nurses but "can just remember the nurses that I worked with just was very condescending." [30-3] at 108:4–20. Reed also believes that these nurses were biased against her for her disability, though does not specify the reason for that belief. [44] ¶ 13.

Defendants assert that Steinhauer and Joan Culver, the Director of Patient Care Services, met with Reed on May 20, 2022, for a thirty-day review, but again cite only unauthenticated record material to support that assertion. [43] ¶ 30. For her part, Reed denies that she had a thirty-day review or ever met with Steinhauer about her performance. *Id.*; [44] ¶ 28; [30-3] at 133:22–134:6, 152:19–20.

In late May 2025, Reed told Dr. Louissaint, who is Black, that Steinhauer "was creating a hostile work environment for her because [Reed] was Black and because of her disability." [44] ¶ 14; [30-3] at 118:14–119:10. Reed further related that Steinhauer "was always short with her when talking, she would cut [Reed] off,

7

[Steinhauer] was condescending, and she would bring up [Reed's] disability." [44] ¶ 14; [30-3] at 121:2–7.

Reed was eventually terminated on June 6, 2022. [43] ¶ 36.[4] Reed filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") on March 20, 2023. *Id.* ¶ 8. After an investigation, IDHR issued a notice of dismissal, and Reed timely filed her original complaint in the Circuit Court of Cook County on February 16, 2024. *Id.* ¶ 9. In her complaint, Reed brought race discrimination and hostile work environment claims under Title VII and the Illinois Human Rights Act ("IHRA") (Counts I and VI); disability discrimination, harassment, and failure to accommodate claims under the Americans with Disabilities Act ("ADA"), the IHRA, and the Rehabilitation Act of 1973 (Counts II, III, IV, and V); and retaliation under Title VII (Count VI). [1-1] ¶¶ 16–56. Defendants removed to federal court on April 5, 2024. [1].

Defendants now move for summary judgment on all counts. [28].

### III.  Analysis

Defendants begin by arguing that Reed is "unable to offer clear and convincing evidence sufficient to establish her claims of racial discrimination, disability discrimination, failure to accommodate, harassment, hostile work environment, and

---

[4] Before terminating Reed, defendants assert that other doctors and nurses reported performance issues related to Reed; that Steinhauer notified her supervisors of these concerns; that Steinhauer, Dr. Louissaint, and Reed had a meeting on May 25, 2022, to discuss the most recent complaints; and that another meeting with unspecified "Franciscan staff" took place on May 31, 2022, to discuss Reed's performance and "outcomes less than separation." *See, e.g.*, [43] ¶¶ 32–36. But in what has become a running theme in this opinion, the Court again notes that defendants have not authenticated the material they offer to support these statements, *id.*, so the statements and underlying materials are not credited. For her part, Reed denies the substance of the performance concerns. *Id.*

8

retaliation." [29] at 4–5. The Court reminds defendants that the burden is not on Reed to establish anything; rather, the burden is on defendants, as movants, to establish that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323.

And while on summary judgment involving claims that require clear and convincing evidence, courts must "consider whether a reasonable factfinder could conclude that the plaintiff had sufficient evidence to meet that burden," *see McLaughlin v. State Farm Mut. Auto. Ins. Co.*, 30 F.3d 861 (7th Cir. 1994), none of Reed's employment discrimination claims impose such a burden, *see E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47 (2025) ("The usual standard of proof in civil litigation is preponderance of the evidence. A more demanding standard, such as clear and convincing evidence, applies only when a statute or the Constitution requires a heightened standard."); *see also id.* at 51 ("Most relevant here, the Court has applied a preponderance standard in Title VII employment-discrimination cases."). The Court therefore applies a preponderance standard.

### A. Race Discrimination Under Title VII and IHRA

To succeed on a Title VII claim, a plaintiff must prove that "(1) he is a member of a class protected by the statute, (2) that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work environment), and (3) that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (cleaned up). The standard for an IHRA discrimination claim is "essentially identical" to that of the Title VII claim, such that the Court "need not

9

analyze them separately." *Bagwe v. Sedgwick Claims Mgmt. Services, Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016).

### 1. Race Discrimination

Defendants do not dispute that Reed is a member of a protected class (Black) or that her termination represents an adverse employment action. [29] at 7, 15. Rather, defendants argue that Reed's "claims for racial discrimination fail because she has presented insufficient evidence that any of Defendants' actions or inactions were taken *because of* her race." *Id.* at 6 (emphasis in original).

The relevant standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race … caused the discharge." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Id.*

Reed points to several incidents to support the inference that her race was the cause of her discharge. First, Steinhauer's use of the racially charged phrase "cotton picking" on more than one occasion, even after Reed told Steinhauer that she considered the phrase racist. [42] at 6. Defendants do not dispute that the phrase "has racial connotations" or that Steinhauer used the phrase. [45] at 6. Instead, they respond that "the term was used only on two to three occasions and it was never said in a direct, derogatory manner to refer to [Reed]." *Id.*

Next, Reed points to a similarly situated white patient care coordinator, Anderson, who started after Reed but received a needed laptop before her. [42] at 7; [44] ¶ 21. The lack of a laptop during training "prevented [Reed] from doing her job

10

because she could not follow when Defendants were giving out instructions." [42] at 7; [44] ¶ 21. Defendants' sole explanation is that this "may have been an oversight." [29] at 6. But defendants provide no detail on the nature of this oversight, why Reed was the subject of the oversight rather than Anderson, or why Reed's repeated requests for a laptop were unsuccessful.

      Reed further argues that defendants' stated rationale for her termination was pretextual. Defendants assert that Reed was fired because she "was not meeting the legitimate expectations of the [patient care coordinator] role," *see* [29] at 7, but the Court has set aside the record material supporting that contention. Moreover, Reed contends that she "was never told that she was on the verge of being fired or that she was doing badly in the job." [42] at 7. In other words, in Reed's view, she was "summarily fired [] without any prior warnings." *Id.* at 8. Reed's version of events supports her race discrimination claim, as "[t]he absence of progressive discipline—such as warnings to the employee about poor performance—can support a finding of pretext if an employer failed to follow its own internal procedures." *Krnich v. FPC Corp.*, 19-CV-5358, 2021 WL 3930306, at *12 (N.D. Ill. Sept. 2, 2021) (citing *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005)).

      The Court is thus left with Reed's version of events, in which she was subjected to racially offensive language, a similarly situated white coworker was treated better than Reed with no explanation for why, and she was terminated summarily and without warning. Together, this is enough to create a genuine dispute of material fact

11

regarding whether her termination was because of her race. *See Abrego*, 907 F.3d at 1012.

The motion for summary judgment is therefore denied regarding Reed's race discrimination claims.

### 2. Hostile Work Environment

Reed's argument that she was subjected to a hostile working environment relies solely on Steinhauer's use of the term "cotton picking … on several occasions." [42] at 10. For support, Reed turns to *Rodgers v. Western-Southern Life Insurance Co.*, which affirmed the judgment for a Black plaintiff on a hostile work environment claim where a supervisor repeatedly used a racial slur the Court is unwilling to print. 12 F.3d 668, 676–77 (7th Cir. 1993).

But "the mere utterance of an epithet which engenders offensive feelings in an employee is not sufficient to establish a hostile work environment." *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 566 (7th Cir. 2004). Instead, Reed must show that Steinhauer's language resulted in a "significantly negative alteration in [her] workplace environment." *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017). "[I]solated incidents" are generally not "serious enough to create an abusive environment" such that it changes the conditions of employment. *Smith*, 388 F.3d at 568. And Reed does not explain how Steinhauer's language "affected her employment conditions or her ability to do her job." *Id.*

Reed thus has not created a genuine dispute of material fact regarding the hostile work environment claim.

12

### 3. Retaliation

Title VII prohibits retaliation against employees who complain of discriminatory activity. 42 U.S.C. § 2000e–3(a). Reed's retaliation claim requires her to prove "(1) that she engaged in statutorily protected activity; (2) that her employer took an adverse employment action against her; and (3) that the protected activity and the adverse employment action are causally connected." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016). The causation factor is the only one at issue here. *See* [29] at 15 ("[I]t is undisputed that Plaintiff did engage in a protected activity ... Further, she did suffer an adverse employment action."). Reed must prove that "the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013). This causation "may be established through circumstantial evidence such as suspicious timing, ambiguous statements, [and] evidence that the stated reason for the employment decision is pretextual." *Gracia*, 842 F.3d at 1019.

Reed relies first on suspicious timing. It is undisputed that Reed met with Dr. Louissaint on May 25, 2022, [45] at 11; that Reed reported to Dr. Louissaint that Steinhauer was "creating a hostile work environment for her because she was Black and because of her disability," *id.*; [44] ¶ 14; and that Reed was terminated 12 days later on June 6, 2022. While there is no bright-line rule about suspicious timing, "an interval of a few weeks or even months may provide probative evidence of the required causal nexus" if there is "corroborating evidence of retaliatory motive." *Gracia*, 842 F.3d at 1021.

13

Defendants argue that despite this close proximity Reed "cannot escape the record developed for this Court, which clearly shows that there were many reports of Plaintiff's inability to meet the requirements of the demanding PCC role." [45] at 11. But, as discussed above, defendants have not authenticated any of these reports, and they therefore cannot be considered at summary judgment. Thus, as with the race discrimination claim, the Court is left with Reed's version of events, which includes her unrebutted testimony that she was terminated suddenly and without warning.

On this record, Reed's sudden, unexplained termination allows the inference of pretext. Combined with the temporal proximity between Reed's complaint of discrimination and her termination, a reasonable jury could conclude that her termination had a retaliatory motive. *See Gracia*, 842 F.3d at 1021. There is thus a genuine dispute of material fact regarding Title VII retaliation.

### B. Disability Discrimination

Claims of disability discrimination under all three statutes—the ADA, the IHRA, and the Rehabilitation Act—are analyzed under the same standard, so the Court applies the ADA framework to each claim. *See Vargas v. DeJoy*, 980 F.3d 1184, 1188 n.4 (7th Cir. 2020) ("[W]e resolve Rehabilitation Act claims by looking to the same standards and provisions that govern the [ADA]."); *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 569 (7th Cir. 2019), as amended (Aug. 9, 2019) ("Illinois courts 'have looked to the standards applicable to analogous federal claims' when evaluating IHRA claims, so we consolidate our analysis of both counts.") (quoting *Sangamon Cty. Sheriff's Dep't v. Ill. Human Rights Comm'n*, 233 Ill.2d 125, 330 (2009)).

### 1. Disparate Treatment

The ADA provides that covered employers shall not "discriminate against a qualified individual with a disability on the basis of disability in regard to … the hiring, advancement, or discharge of employees, … and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "To prevail on a disparate treatment claim, a plaintiff must show (1) he was disabled, (2) he was qualified to perform essential functions with or without reasonable accommodation, and (3) his disability was the 'but for' cause of the adverse employment action." *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 632–33 (7th Cir. 2020). A "qualified individual" is one who "can perform the essential functions of the employment position." 42 U.S.C. § 12111(8).

Defendants "do not contest that Plaintiff is considered disabled due to cancer and neuropathy." [29] at 9; *see also id.* at 10 (conceding that Reed "is a qualified individual with a disability"). Rather, defendants argue only that Reed "has failed to present sufficient evidence that she suffered an adverse employment action due to her disability" because "[t]here are an abundance of documented complaints and reported incidents relating to Plaintiff's failure to perform as a PCC." *Id.* But, again, defendants have not presented those complaints and reported incidents in a form the Court can consider at summary judgment. The Court is again left with Reed's version of events, in which she is terminated suddenly and without warning. As with the discrimination and retaliation claims, a reasonable jury could find that Reed's termination was pretextual, which in turn allows an inference of causation regarding her disabled status.

15

There is thus a genuine dispute of material fact regarding whether Reed was terminated due to her disability.

### 2. Failure to Accommodate

"Discrimination can take the form of … failing to make reasonable accommodations to the known limitations of the employee." *Youngman v. Peoria Cnty.*, 947 F.3d 1037, 1041–42 (7th Cir. 2020) (citing 42 U.S.C. § 12112(b)). To prevail on her failure-to-accommodate claim, Reed must show that (1) she was a qualified individual with a disability, (2) Franciscan was aware of her disability, and (3) Franciscan failed to reasonably accommodate her disability. *Id.*

Defendants again "do not contest that Plaintiff is a qualified individual with a disability of cancer in remission and associated neuropathy." [29] at 10. Instead, defendants argue that Reed "never expressed that she would require any accommodations to perform her role as PCC" during her hiring. *Id.* at 10–11.

But defendants' fixation on Reed's hiring leads them astray. The ADA requires that employers make "reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability who is an applicant *or employee*, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A) (emphases added). Nothing in the statute restricts this obligation to what is known at the time of hiring, and whether or not Reed informed defendants of her disabilities during her onboarding, it is undisputed that Reed informed Steinhauer of these disabilities later. [44] ¶ 6 ("In addition to [Reed] telling Steinhauer about her accommodations the first time she met with Steinhauer,

16

Plaintiff also discussed restrictions with Steinhauer on April 28th … [and again] on May 20th or May 25th.").

"After an employee's initial disclosure [of a need for disability accommodations], the ADA obligates the employer to engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005) (cleaned up). "This step imposes a duty on employers to engage in a flexible give-and-take with the disabled employee so that together they can determine what accommodation would enable the employee to continue working." *Id*. The employer avoids liability for lack of participation in the interactive process only if no reasonable accommodation is available. *Id*.

Here, defendants do not dispute that they were aware of Reed's disability and request for accommodations and do not argue that the accommodations Reed sought—for example, a lifting restriction and breaks—were not possible. Indeed, neither defendants nor Reed allege facts suggesting that defendants participated in the interactive process at all after Reed disclosed her disability and need for accommodations. While a failure to engage in the interactive process is not an independent source of ADA liability, it becomes so "if it prevents identification of an appropriate accommodation for a qualified individual." *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013).

17

Because no accommodation was given, and because defendants do not dispute that Reed's suggested accommodations were reasonable, there is a genuine dispute of material fact regarding failure to accommodate.

### 3. ADA Hostile Work Environment

"[H]ostile work environment claims are cognizable under the ADA." *Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 851 (7th Cir. 2019). Reed argues that she was subject to harassment on the basis of her disability because she was "was forced to work without accommodation, denied assistance, and subjected to demeaning and dismissive treatment when she complained of pain and requested relief." [42] at 12.

But Reed appears to concede that the only timely act of alleged harassment was her termination. *Id.* Reed suggests that her termination was part of "a continuing violation that should be considered in full," *id.*, but does not explain how it connects to other instances of alleged harassment. And single "discrete acts" like termination, which is actionable in itself, is generally not sufficient to support a hostile work environment claim. *See Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008) ("What makes a hostile environment claim exceptional is that the acts that constitute it do not give rise to a cause of action by themselves.").

There is thus not a genuine dispute of material fact regarding Reed's hostile work environment claim under the ADA.

## IV. Conclusion

For the reasons provided above, defendants' motion for summary judgment is granted with regard to Reed's claims of a hostile workplace under Title VII and the ADA. The motion is denied as to all other claims.

The Court sets a status hearing for 3/17/2026nat 9:30 a.m. The parties are directed to meet and confer on trial dates in 2026 in advance of the status hearing. The parties should also come to the status hearing prepared to discuss any realistic possibility of settlement.

ENTER:

                                                Georgia N. Alexakis
                                                United States District Judge

Date: 3/4/2026